UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA,**<br><br>    **Plaintiff,**<br><br>        v.<br><br>**EVAUDNEE BRYANT-JAMES,**<br>Mother and Next Friend of E.T., a Minor,<br><br>    **Defendant.** | Civil Action No. 08-2251 (JDB) |

## MEMORANDUM OPINION

Plaintiff District of Columbia brings this action against Evaudnee Bryant-James, mother and next friend of her minor son E.T., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. The District challenges an adverse administrative decision holding that it denied E.T. a free appropriate public education by failing to place him in a full-time special education program. Currently before the Court are [11, 14] the parties' cross-motions for summary judgment. Upon consideration of the motions, the parties' memoranda, the administrative record, the applicable law, and the entire record herein, and for the reasons set forth below, the Court will deny the District's motion for summary judgment and will grant Bryant-James' cross-motion for summary judgment.

### BACKGROUND

**I. The Individuals with Disabilities Education Act**

Under IDEA, all states that receive federal education assistance, which includes the District of Columbia, must establish policies and procedures to ensure that "[a] free appropriate

public education ["FAPE"] is available to all children with disabilities residing in the State . . . ." 20 U.S.C. § 1412(a)(1)(A). The law defines a FAPE as "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [law]." Id. § 1401(9). Once a child is found to qualify for a FAPE, the school district is required to develop and implement an individualized education program ("IEP") for him or her. Id. § 1414(d)(2)(A). The IEP comprehensively describes the student's present academic level, details measurable annual goals for the student, specifies necessary educational and related services, and establishes the extent to which the student will participate in a regular education classroom. Id. § 1414(d)(1)(A)(i).

To develop the IEP, a team determines where the student should be placed. Id. § 1414(e). If no public school can meet the child's needs, the state is required to place him or her at an appropriate private school and pay the tuition. Id. § 1412(a)(10)(B)(i); see also Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985). If a parent disagrees with the IEP or the subsequent school placement, he or she is entitled to an "impartial due process hearing" conducted by the state or local educational agency. 20 U.S.C. § 1415(f)(1)(A). Any party may bring a civil action challenging the hearing officer's decision. Id. § 1415(i)(2)(A).

**II. Factual Background**

E.T. is a thirteen-year-old eighth grade student who attended Ideal Academy Public Charter School from pre-kindergarten through the 2007-08 school year. Administrative Record

("AR"), at 5-6.

E.T.'s parents first asked the District of Columbia Public Schools ("DCPS") to address difficulties their son was having with reading in 2003.  Id. at 6.  In May of 2007, DCPS still had not acted on these requests, and E.T.'s parents filed an administrative due process complaint to obtain evaluations of their son.  Id. at 99.  The parties settled, and DCPS agreed to fund numerous evaluations of E.T.  Id. at 255-56

These evaluations began in early 2008.  A psychoeducation evaluation concluded that E.T. "suffers from difficulties with reading and processing speed," deficiencies which "interfere with his academic performance and therefore preclude[] him from performing at his 'real' level of intellectual ability."  Id. at 123.  The evaluator determined that E.T. "would benefit from being placed in a classroom setting where he would receive instructions that are commensurate with the rate at which he learns."  Id. at 124.

E.T. also underwent a clinical psychological evaluation.  The evaluator found that E.T. "has significant processing speed difficulties that negatively influence his performance in the school environment," and determined that E.T. should be given shorter assignments and test questions, as well as extra time to complete his work.  Id. at 141.  She also concluded that E.T. "requires supportive therapy to address[, inter alia,] emotional reaction to academic difficulties."  She wrote, though, that E.T. "is not currently considered as a student requiring special education services."  Id.

E.T. had a speech and language evaluation as well.  The evaluator assessed E.T. as having "significant deficits in auditory and phonological processing affecting his receptive language and reading skills."  Id. at 135.  She recommended that E.T. be placed in a structured and systematic

reading program, and that his teachers break complex directions into simpler form and grant him extra time to complete assignments. Id. She further suggested that E.T. receive speech and language therapy twice a week for 30 minutes. Id.

E.T. also received a social history evaluation. Id. at 162-63. The evaluator concluded that "[c]ontinuation in a regular education setting could further delay [E.T.'s] progress rate and cause social-emotion stress." Id. at 163. He found that E.T. needed a "small structured setting with a low teacher to student ratio to facilitate specialized instruction," "[i]ndividual counseling once a week," as well as remedial assistance. Id.

In April 2008, a multidisciplinary team met to review E.T.'s evaluations. Recognizing that E.T. had speech and language deficiencies, the team developed an IEP whereby E.T. would be given extended time to complete assignments, id. at 244, and would receive two hours of counseling and two half-hour sessions of speech/language therapy per week, id. at 235. E.T. was to remain full-time in Ideal Academy's general education population. Id. at 240. E.T.'s parents agreed with the IEP. Id. at 235.

E.T. received two additional evaluations over the next two months. The first was a neuropsychological evaluation. Id. at 145-56. The evaluator judged that E.T. was functioning "below" or "well below expectation" in a number of areas, and that he would "require frequent monitoring, frequent rephrasing of questions, and demonstration of tasks in order to get him to do what is expected of him. [His] inadequate comprehension and impulsivity suggest that he is likely to have difficulty completing tasks . . . without one-on-one attention . . . ." Id. at 151. Concluding that E.T. "will need intensive academic services," the evaluator suggested that E.T. receive counseling, and be placed "in a school environment where efforts are made to simplify

information and tasks," and where he would get extra time to complete assignments.  Id. at 152.

The second evaluation was an auditory processing evaluation performed by Dr. Jay Lucker.  Id. at 165-72.  Dr. Lucker concluded that E.T. "is desperately in need of interventions to help him deal with and overcome" his numerous and significant deficits in auditory information processing.  Id. at 169.  He recommended that E.T. be given quiet learning, study, and testing environments, be taught using visual cues, and receive "pre-teaching."  Id. at 170-71.  He also suggested several direct treatment educational programs.  Id. at 171.

On July 30, 2008, the multidisciplinary team reviewed E.T.'s more recent evaluations and issued a new IEP.  The team agreed that E.T. should receive one-on-one instruction, that assignments should be presented in smaller pieces, and that teachers would repeat directions.  Id. at 56.  The team also determined that, in addition to the therapy he was already receiving, E.T. would receive seven hours per week of specialized instruction.  Id. at 51.  He was to remain at Ideal Academy, but would be out of the general education population 21-60% of the time.  Id. E.T.'s parents felt a full-time specialized educational setting was necessary to address E.T.'s needs, id. at 59-60, and did not agree to the updated IEP, id. at 51.

The following week, Dr. Lucker added an addendum to his report to "clarif[y]" his recommendation.  Id. at 176-77.  He wrote that E.T. "is in need of intensive interventions.  He requires a small class setting that is quiet and distraction free. . . . [S]ervices must be provided individually, on a pull out basis at least three times a week."  Id. at 176.  He then observed that, "[b]ecause [E.T.'s] problems are related to listening and communication skills, the classroom has to be a very highly structured, communication based classroom environment in which language is controlled and noise levels are kept very low."  Id.  Finally, he offered that "since [E.T.'s]

problems will affect his learning, he needs learning support services from a special education teacher or a special education learning environment." Id.

Several days later, E.T.'s parents filed an administrative due process complaint alleging that DCPS denied E.T. a FAPE. Id. at 39-50. They insisted that E.T.'s July IEP was inappropriate, and that Ideal Academy was an inappropriate placement. Id. at 45-46. They asked DCPS to place and fund E.T. "at the parent's placement of choice." Id. at 48.

A hearing officer held a due process hearing on September 4 and 5, 2008, with testimony given by, among others, Dr. Lucker and Azalee Webster, Ideal Academy's special education coordinator. A week later, the hearing officer concluded that E.T.'s July 30 IEP and placement at Ideal Academy were inappropriate, and ordered DCPS to fund E.T. at Kingsbury Academy, a full-time special education facility. Id. at 14. The District appealed to this Court.

## STANDARD OF REVIEW

Under the IDEA, "[a]ny party aggrieved by the findings and decision" rendered during administrative proceedings may "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2), (i)(3)(A); accord 34 C.F.R. § 300.516(a). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); accord 34 C.F.R. § 300.516(c).

The preponderance-of-the-evidence standard of review does not authorize unfettered de novo review. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982). Rather, consideration of the record impliedly requires courts to give "due weight" to

the administrative proceedings, id., and "[f]actual findings from the administrative proceeding are to be considered prima facie correct," S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003). Therefore, courts may not substitute their own views for those of the hearing officer, see Rowley, 458 U.S. at 206, and a court upsetting a hearing officer's decision "must at least explain its basis for doing so," Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988). At the same time, "the district court's authority to 'hear additional evidence at the request of a party,' and 'bas[e] its decision on the preponderance of the evidence' . . . 'plainly suggest[s] less deference than is conventional' in administrative proceedings." Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting Kerkam, 862 F.2d at 887). On review of a hearing officer's decision, the burden of proof falls upon the party challenging the administrative determination, who must "'at least take on the burden of persuading the court that the hearing officer was wrong.'" Reid, 401 F.3d at 521 (quoting Kerkam).

## ANALYSIS

To ensure that a student with a disability receives a FAPE, the school district must provide the student with both an appropriate IEP and an appropriate school placement. 20 U.S.C. § 1401(9). The District challenges the hearing officer's conclusion that neither E.T.'s IEP nor his placement was appropriate. The Court takes each in turn.

**I. Was E.T.'s IEP appropriate?**

"The Supreme Court has held that a state fulfills its obligation to provide a free appropriate public education to a handicapped child 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" Shaw v. D.C., 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (quoting Rowley, 458 U.S. at 203).

"'Implicit' in the IDEA's guarantee of a free appropriate education 'is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child.'" Id. (quoting Rowley, 458 U.S. at 200).  Thus, for an IEP to be appropriate, it must be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 206-07.

The parties' disagreement over E.T.'s July IEP is relatively narrow.  Neither side disputes the validity of the two evaluations performed after E.T.'s April 2008 IEP.  And neither side takes issue with the expertise or the suggestions offered by those evaluators, primarily Dr. Lucker.  The only question, then, is whether the July IEP reflects those evaluators' recommendations.

The Court concludes it does not, as it fails to address Dr. Lucker's chief concerns. Dr. Lucker was quite clear that E.T. "requires a small class setting that is quiet and distraction free."  AR at 176.  His "classroom has to be a very highly structured, communication based classroom environment in which language is controlled and noise levels are kept very low."  Id. Thus, E.T. "needs an environment where [ambient sounds are] even below that" of a normal classroom.  Sept. 4, 2008, Hearing Transcript ("HT") at 49-50 (Testimony of Dr. Lucker); see also id. at 32-33 ("Placement-wise, he needs a quiet environment, a noise-controlled environment, a language-controlled environment where the language used is well understood by him, by the class."); id. at 34 (E.T.'s environment must be "quiet and noise-controlled and noise free").  E.T. also needs a certain, unique kind of instruction: his "[t]eachers are going to need to go slowly. . . . [They] need to watch his expression to make sure he gets things, so they don't go on to new information before they know he's gotten the previous information."  Id. at 33; see also id. (E.T.'s teachers must "make sure that [they] checked that he understands and comprehends

before [they] go on to the next information").

Dr. Lucker was also worried about how E.T.'s educational needs would affect his classmates. He testified that E.T. "needs to be in a classroom where the teacher is going slowly and simplifying the language is not going to impact his peers." Id. at 73; see also id. at 71 (a public school environment could be appropriate, but only where "the teacher know[s] how to speak and present verbal information to [E.T.], and [where] it appears as if other people . . . also would need the teacher to speak slowly"); id. at 73-74 ("it's not an appropriate placement" for E.T. to be in "a regular education classroom where you have children who look at a teacher or listen to a teacher who is speaking slowly and very distinctly, and breaking things down and the kids are being turned off").

But the July IEP did not deal with these concerns. The IEP says nothing about providing E.T. with a noise-controlled environment, nor does it address E.T.'s classmates, even though it anticipates that E.T. will remain largely within Ideal Academy's general education population. AR at 221. Under the July IEP, then, E.T. would be placed, on a daily or near-daily basis, in precisely the educational setting that Dr. Lucker deemed inappropriate.[1]

---

[1] DCPS argues that, under the IEP, "E.T. was to be placed in a small group setting and given preferential seating, which would have provided him with a classroom environment with low noise levels." Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Docket Entry 15], at 5. But a small class size on its own in no way guarantees a low noise level, and certainly not one at the level required by E.T. In any event, E.T.'s mother testified at the hearing that she visited E.T.'s class at Ideal Academy "all the time," and that "although the classroom setting is small [eleven students], they do have some kids that are very, very disruptive to the point where the teacher is actually stopping the entire class." HT at 184-85. But see id. at 131-32 (testimony of Azalee Webster) (describing the sound levels in E.T.'s classroom as "very comfortable"). The District has offered no argument for why the Court should accept Ms. Webster's testimony over Bryant-James', and therefore cannot meet its burden to persuade the Court that the hearing officer was wrong on this point. See Reid, 401 F.3d at 521.

As the District points out, the July IEP is responsive to <u>some</u> of the concerns expressed by E.T.'s evaluators.  For example, the July IEP significantly increased the specialized education E.T. was to receive, adding seven hours of individualized teaching.  AR at 221.  This comports with Dr. Lucker's recommendation that E.T. receive individualized services at least three times a week.  <u>Id.</u> at 176.  Moreover, E.T.'s class was only eleven students, within the range Dr. Lucker recommended.  <u>See</u> HT 147 (Testimony of Azalee Webster); <u>see also id.</u> at 50-51 (Testimony of Dr. Lucker) (an appropriate class size would be eight to twelve students).

But despite being partially responsive to E.T.'s evaluators' recommendations, the July IEP would nonetheless keep E.T. in a substantially inappropriate educational setting.  As the hearing officer stated in her written opinion, "every evaluation and the testimony of Dr. Lucker makes clear that the student must be instructed differently from other students in order to access educational information. . . .  [H]e must be taught in a small, structured classroom.  This is extremely difficult in a general education classroom."  AR at 13.  E.T.'s July IEP fails to address this issue.  Accordingly, the Court finds that the hearing officer correctly concluded that "[t]here is no question but that . . . the student's needs are not being met by his present IEP."  <u>Id.</u> at 12.[2]  And the District offers no convincing reason why the hearing officer's assessment was wrong.  Therefore, the Court affirms the hearing officer's conclusion that E.T.'s IEP was inappropriate, and that "the student does require a full-time out of general education placement to meet his

---

[2] As part of its analysis, the hearing officer wrote that "DCPS misunderstands [E.T.'s] needs."  <u>Id.</u> at 12.  The District objects that this statement is based on a mischaracterization of the District's legal position and of Azalee Webster's testimony.  <u>See</u> Pl.'s Mot. for Summ. J. [Docket Entry 11], at 19-20.  The Court need not address this specific point, however, as it does not bear on whether E.T.'s IEP was "appropriate" under IDEA.

needs." Id.[3]

## II. Was E.T.'s placement at Ideal Academy appropriate?

Even where a student's IEP is rejected, as here, the Court must still determine whether the student's initial school placement is nonetheless appropriate for the students' needs. See 20 U.S.C. § 1401(9). The District does not dispute, however, that Ideal Academy cannot provide E.T. with the full-time special education program that the hearing officer concluded E.T. needed. See HT at 158-59 (Testimony of Azalee Webster).[4] Accordingly, the Court concludes that E.T.'s placement at Ideal Academy is inappropriate to address his educational needs.

## **CONCLUSION**

For the foregoing reasons, the Court will affirm the hearing officer's finding that E.T.'s IEP and academic placement are inappropriate, and that DCPS has thus denied E.T. a FAPE. A separate order accompanies this memorandum opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: December 28, 2009

---

[3] The District does not argue that, even if E.T.'s IEP was inappropriate, the Court should still find that the hearing officer erred in concluding that E.T. requires a full-time special education program.

[4] The District also does not dispute that Kingsbury, E.T.'s present school, is an appropriate placement for a full-time special education student.